In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 24-3296

FRANK WILLIAM BONAN, II, individually and as an institution-affiliated party of GRAND RIVERS COMMUNITY BANK, GRAND CHAIN, ILLINOIS (INSURED STATE NONMEMBER BANK),

*Petitioner*,

*v.*

FEDERAL DEPOSIT INSURANCE CORPORATION,

*Respondent*.

---

Petition for Review of
an Order of the Federal Deposit Insurance Corporation.
Nos. FDIC-16-0254e & FDIC-16-0256k.

---

ARGUED SEPTEMBER 3, 2025 — DECIDED AUGUST 12, 2026

---

Before SCUDDER, KIRSCH, and PRYOR, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Frank William Bonan II was a banker in Illinois. In 2021, the Federal Deposit Insurance Corporation commenced an administrative enforcement action against him related to misconduct at Grand Rivers Community Bank. During the administrative proceedings, the FDIC's Board of Directors found that Bonan had engaged in unsafe

or unsound banking practices and breached his fiduciary duties to Grand Rivers. It then imposed an order pursuant to 12 U.S.C. § 1818(e) prohibiting Bonan from working at any FDIC-insured institution and assessed a $105,000 civil money penalty pursuant to 12 U.S.C. § 1818(i)(2)(B). In his petition for review, Bonan urges us to reverse the FDIC's decision and vacate its orders, primarily contending that the administrative adjudication violated his jury trial right under the Seventh Amendment. While Bonan's Seventh Amendment claim presents a close question, we ultimately find no violation under the law as it stands today. As for Bonan's other challenges to the FDIC's administrative enforcement action, we see no compelling ground for relief. In the end, then, we deny the petition for review.

## I

### A

Frank Bonan served as chairman of the Board of Directors of Grand Rivers Community Bank. He also sat on the Bank's loan committee. By all accounts, Bonan managed Grand Rivers with an iron fist, acting as the dominant and uncompromising decisionmaker. Grand Rivers is a federally insured depository institution under the Federal Deposit Insurance Act. Bonan simultaneously held meaningful roles at People's National Bank in McLeansboro, Illinois. Beyond serving as president for PNB's southern region, Bonan had positions on the institution's Board of Directors and Executive Loan Committee.

The key events underlying the FDIC's enforcement action began in 2015. At the heart of it are Evergreen Drilling and Evergreen Properties (and related borrowers), which

operated an oil-drilling business based in Carmi, Illinois. Evergreen had outstanding secured loans with both Grand Rivers and PNB, and Bonan managed the Evergreen loan relationship for both banks. The FDIC's enforcement action focused on Bonan's involvement in two matters arising from Grand Rivers's financial relationship with Evergreen.

### 1. The 618 Holdings Loan

In 2015, the oil-drilling industry faced a severe downturn. Evergreen, in turn, confronted financial difficulties, prompting concern from Bonan and others at PNB that the company would not be able to service its debt. In September 2015, Bonan prepared a "Plan for Evergreen" that proposed the company sell collateral and refinance its debt to pay down its loans from PNB and Grand Rivers.

One piece of Bonan's plan centered on a local commercial warehouse that served as Evergreen's headquarters. In the fall of 2015, there were two liens on the warehouse, one securing PNB's $358,000 first mortgage and another securing Grand Rivers's $638,000 second mortgage. Bonan contemplated that Evergreen would engage in a sale and leaseback transaction through which the company would sell its warehouse, use the proceeds to pay down its loans, and then continue to use the warehouse under a new lease.

While Bonan originally envisioned that his personal company would purchase the Evergreen warehouse, he ultimately found two other buyers: James Harbison and Adam Tate. In December 2015, Bonan asked them to purchase the warehouse with financing from Grand Rivers. At the time, both Harbison and Tate personally worked for Bonan and lived rent free in housing that Bonan owned. Neither was

financially stable: Harbison had negative net worth of $190,000 and earned $62,000 annually, and Tate's net worth was $20,000 with annual earnings of $27,000.

On or before December 17, 2015, Bonan directed Grand Rivers's Chief Financial Officer to prepare a loan request on behalf of Harbison and Tate. The request stated that the loan was to purchase the warehouse from Evergreen for $1.25 million and came in the name of 618 Holdings, LLC—an entity not legally formed until December 30, 2015.

On December 23, the Grand Rivers Board of Directors voted to approve the $1.25 million loan to 618 Holdings, an entity that still did not exist. The votes were three in favor, none opposed, and two abstaining. Bonan initially voted in favor but ultimately abstained. Grand Rivers's Chief Financial Officer, who voted in favor of the loan, later testified that he did so at Bonan's direction, fearing he would lose his job if he voted no and crossed Bonan.

Several aspects of the resulting transaction bear emphasis. The final loan from Grand Rivers to 618 Holdings was for $1,262,109.75 and required a monthly payment of $7,752.94 (totaling $93,035.28 per year). The amount due annually exceeded the combined incomes of Harbison and Tate ($89,000). Additionally, 618 Holdings used this loan to purchase the warehouse, which it then leased back to Evergreen. The loan proceeds paid off the debts secured by PNB's and Grand Rivers's liens on the warehouse. The deal also placed $150,000 of the remaining proceeds into an escrow account to be automatically applied for the first 18 months of Evergreen's lease payments to 618 Holdings.

What all of this means is that Grand Rivers's loan funded both the purchase of the warehouse and Evergreen's initial ability to make lease payments, which, in turn, supplied 618 Holdings with money to repay the loan. Grand Rivers's Chief Financial Officer testified that he structured the transaction this way at Bonan's instruction. Overall, the terms of purchase and the lease agreement were nearly identical to those that Bonan had negotiated when contemplating the purchase himself.

In January 2016, two FDIC examiners reviewed the 618 Holdings loan. They classified it as substandard "due to the lack of financial capacity of the debtors, the inappropriate structuring of the 618 Holdings credit in which an indirect [principal and interest] reserve account was established to make loan payments, the lack of collateral protection, and the questionable ability of Evergreen Properties to generate sufficient income to pay lease payments."

In April 2016, Grand Rivers placed the 618 Holdings loan on non-accrual status. In January 2017, Grand Rivers charged off $500,000 from the loan, effectively deeming that amount uncollectible. 618 Holdings then defaulted on the loan, entering into a deed-in-lieu of foreclosure with Grand Rivers. At the time of the FDIC's administrative proceedings, Grand Rivers still held title to the Evergreen warehouse.

## 2. The Release of the Rig 23 Collateral

The second event involves a series of errors related to another piece of Evergreen's collateral securing a separate loan from Grand Rivers. In November 2015, officers at Grand Rivers mistakenly released the Bank's purchase money security interest in Rig 23, an oil-drilling rig that Evergreen owned.

The mistake occurred in conjunction with Evergreen's sale of Rig 24, a less valuable oil drilling rig in which Grand Rivers never had a security interest. When Grand Rivers discovered the erroneous release in early 2016, it took a lower priority blanket lien in Evergreen's assets, now subordinate to PNB's interest. In January 2017, Grand Rivers charged off $489,268 from its Evergreen loan originally secured by Rig 23.

B

In May 2021, the FDIC initiated an administrative enforcement action against Bonan. Based on his role in the 618 Holdings loan and the release of Rig 23, the agency alleged that Bonan had engaged in unsafe or unsound banking practices and breached his fiduciary duties to Grand Rivers. The Notice of Charges sought an order prohibiting Bonan from working at federally insured banks (12 U.S.C. § 1818(e)) as well as a civil money penalty (12 U.S.C. § 1818(i)).

In January 2023, an FDIC administrative law judge conducted a six-day hearing, at which Bonan testified and cross-examined other witnesses. In November 2023, the ALJ issued a recommended decision, concluding that Bonan engaged in professional misconduct that merited both sanctions. For his part, Bonan disagreed and filed exceptions to the recommended decision.

In December 2024, the FDIC Board issued its decision and orders. The Board found that Bonan's misconduct in pushing through the financially unsound 618 Holdings loan satisfied the requirements for a prohibition order under § 1818(e). And, based on similar reasoning, the Board also found that Bonan's involvement in the 618 Holdings loan merited a second tier civil money penalty under § 1818(i)(2)(B) in the

amount of $105,000. Finally, the Board determined that Bonan's misconduct related to the Rig 23 release, which largely involved pressuring his subordinates into making a mistake, also supported a $105,000 civil money penalty.

Bonan then petitioned for our review. See 12 U.S.C. § 1818(h)(2). He raises five challenges to the FDIC's enforcement action and orders. The first three are constitutional claims, while the fourth and fifth dispute the FDIC's decision and penalties on mainly evidentiary grounds.

## II

We begin with Bonan's contention that the FDIC's in-house adjudication of its enforcement action based on §§ 1818(i) & (e) violated his Seventh Amendment right to a jury.

The Seventh Amendment provides that "[i]n Suits at common law, … the right of trial by jury shall be preserved." U.S. Const. amend. VII. In *SEC v. Jarkesy*, the Supreme Court established a two-step framework for applying this constitutional guarantee in the context of administrative enforcement proceedings. 603 U.S. 109 (2024). First, we ask the "threshold" question whether the administrative action "implicates the Seventh Amendment." *Id.* at 120. If the answer at the first step is yes, we "next consider whether the 'public rights' exception to Article III jurisdiction applies." *Id.* When the public rights exception applies, "Congress may assign the matter for decision to an agency without a jury, consistent with the Seventh Amendment." *Id.* at 127.

The first step is straightforward here. The Seventh Amendment, the Court has explained, extends to statutory claims if they are "legal in nature." *Id.* at 122 (cleaned up). To

make this determination, we examine both "the cause of action and the remedy it provides," giving more weight to the nature of the remedy. *Id.* at 122–23; see also *Tull v. United States*, 481 U.S. 412, 421 (1987) ("[T]he relief sought is more important than finding a precisely analogous common-law cause of action in determining whether the Seventh Amendment guarantees a jury trial." (cleaned up)). The FDIC acknowledges that the civil money penalty it imposed on Bonan pursuant to 12 U.S.C. § 1818(i) is "the prototypical common law remedy," *Jarkesy*, 603 U.S. at 123, and it therefore does not contest that this aspect of its administrative enforcement action implicated the Seventh Amendment. As for the FDIC's claim seeking a prohibition order pursuant to 12 U.S.C. § 1818(e), we accept Bonan's invitation to treat this aspect of the agency's enforcement action as legal in nature—a point the FDIC does not dispute. So we proceed to *Jarkesy*'s next step for both claims.

Step two of *Jarkesy*'s Seventh Amendment framework embeds a notorious thicket in the law: the public rights exception to Article III jurisdiction. At a high level, this doctrine roots itself in the principle of separation of powers. See *id.* at 127. Article III of the Constitution provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. "Under the basic concept of separation of powers that flows from the scheme of a tripartite government," this judicial power "cannot be shared with the other branches." *Jarkesy*, 603 U.S. at 127 (cleaned up). As a result, the Supreme Court has understood Article III's vesting of judicial power to require that "matters concerning private rights … not be removed from Article III courts." *Id.* At the same time, the Court

has recognized "a class of cases" concerning "public rights," where "no involvement by an Article III court in the initial adjudication is necessary." *Id.* at 128.

The Supreme Court "has not definitively explained the distinction between public and private rights." *Id.* at 131 (cleaned up); see also *id.* at 130 (acknowledging that "[t]his is an area of frequently arcane distinctions and confusing precedents" (cleaned up)). In *Jarkesy*, the Court suggested that cases involving public rights fall into a set of "historic categories of adjudications." *Id.* at 130. But the Court did not overrule, and indeed relied on, a separate line of precedent applying the public rights exception to the adjudication of statutory claims. See *id.* at 132–40 (discussing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), and *Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442 (1977)); see also *Axalta Coating Sys. LLC v. Fed. Aviation Admin.*, 144 F.4th 467, 473 (3d Cir. 2025) (observing that the Supreme Court "resolved the public rights question in *Jarkesy* in a notably uncomplicated way: by analogizing the [agency's] enforcement action to the action at issue in one public rights precedent … and distinguishing it from the enforcement action at issue in another"); *Sligo Creek Ctr. v. United States Dep't of Health & Hum. Servs.*, 177 F.4th 556, 559–60 (4th Cir. 2026) (agreeing with the Third Circuit's characterization of *Jarkesy*). Those previous decisions guide our analysis here.

In *Atlas Roofing*, the Court announced a broad rule permitting agencies to pursue in-house enforcement of federal statutory violations. See 430 U.S. at 455. The Occupational Safety and Health Review Commission imposed monetary penalties on two private employers, including Atlas Roofing, finding that they violated safety standards promulgated under the

Occupational Safety and Health Act of 1970. See *id.* at 447–48. Atlas and the second company then petitioned for review in federal court, urging that the administrative adjudication of the alleged violations ran afoul of the Seventh Amendment. See *id.* at 448–49.

The Court disagreed and upheld the constitutionality of the administrative enforcement action. See *id.* at 461. "[W]hen Congress creates new statutory 'public rights,'" enforced by the government in its sovereign capacity, the Court explained, "it may assign their adjudication to an administrative agency with which a jury trial would be incompatible." *Id.* at 455. The Court concluded that the adjudication at issue involved public rights because Congress, in enacting the Occupational Safety and Health Act, created new statutory obligations, "unknown to the common law," to remedy national workplace safety concerns. *Id.* at 450, 461.

By its terms, *Atlas Roofing* recognized that Congress has broad authority to create public rights by developing new causes of action within federal statutes that seek to address national problems. See *id.* at 461 ("The Seventh Amendment is no bar to the creation of new rights or to their enforcement outside the regular courts of law."); see also *Axalta*, 144 F.4th at 483 ("[A]ny time Congress creates a cause of action enforced by the government, *Atlas Roofing* presumes that it involves a public right.") (Bibas, J., concurring).

While *Atlas Roofing* remains good law, the Court has narrowed its application in two subsequent decisions. The first was *Granfinanciera*, in which the Court determined that a fraudulent conveyance action codified in the Bankruptcy Code involved private rights. See 492 U.S. at 55. Because "Congress simply reclassified a pre-existing, common-law

cause of action that was not integrally related to the reformation of debtor-creditor relations" as one triable by a non-Article III bankruptcy judge, the Court concluded that this "purely taxonomic change" could not render the statutory cause of action one involving public rights. *Id.* at 60–61. All of this was despite the undeniable observation that the Bankruptcy Code reflects a comprehensive statutory scheme for providing debt relief and enabling financial reorganization.

The second narrowing came in *Jarkesy*, when the Court confirmed and emphasized that not all obligations in federal statutes fall within *Atlas Roofing*'s public rights ambit. The clarification came as the Court considered "whether the Seventh Amendment entitles a defendant to a jury trial when the SEC seeks civil penalties against him for [statutory] securities fraud." *Jarkesy*, 603 U.S. at 120. The Court resolved the question in the affirmative, concluding that the statutory securities fraud actions at issue involved private rather than public rights. See *id.* at 134. "If a suit is in the nature of an action at common law," the Court emphasized, "then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory." *Id.* at 128.

While the statutory fraud actions at issue in *Jarkesy* were not identical to their common law counterpart, see *id.* at 126, they "target[ed] the same basic conduct as common law fraud, employ[ed] the same terms of art, and operate[d] pursuant to similar legal principles," *id.* at 134. In short, the SEC's enforcement action based on the antifraud provisions of the federal securities laws was "a common law suit in all but name." *Id.* at 136. This meant that Congress's placement of the action within a federal regulatory scheme did not transform it into one involving public rights. See *id.* at 134.

But *Jarkesy* stopped short of overruling *Atlas Roofing*. To the contrary, the Court left *Atlas Roofing* in place for statutory causes of action that cannot "trace[] their ancestry to the common law." *Id.* at 137; see also *Axalta*, 144 F.4th at 475 (observing that in *Jarkesy* "the Court distinguished, but did not overrule, its holding in *Atlas Roofing*"). After *Jarkesy*, then, *Atlas Roofing* continues to govern the public rights inquiry for agency enforcement actions based on statutory standards that "bring no common law soil with them," *Jarkesy*, 603 U.S. at 137, while *Jarkesy* applies to "traditional legal claims" embedded in statutes, *id.* (cleaned up).

When it comes to discerning whether a statutory claim brings with it "common law soil," we believe the analysis should focus on the Founding Era. We say this because, in laying the foundation for its public rights analysis, the Court in *Jarkesy* explained that "[a] hallmark that we have looked to in determining if a suit concerns private rights is whether it is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Id.* at 127–28 (cleaned up).

*Jarkesy* also explicitly relied on principles it derived from its prior decision in *Granfinanciera*. See *id.* at 134 ("*Granfinanciera* effectively decides this case."). In *Jarkesy*'s recitation of the relevant points from *Granfinanciera*, the Court highlighted that "[a] survey of English cases showed that actions to recover fraudulent transfers were often brought at law in late 18th-century England." *Id.* at 133 (cleaned up).

To be sure, *Jarkesy* did not expressly tell us how its analysis would apply to a statutory claim with an analogue to a cause of action that became part of the common law later than 1789. But our best answer based on the guidance we find in *Jarkesy*

is that common law at the Founding should be our benchmark for private rights.

Putting this all together, our task under *Jarkesy*'s second step is to determine whether the statutory claims the FDIC administratively brought against Frank Bonan were akin to suits at common law at the Founding and governed by *Jarkesy*, or are instead unknown to the common law and governed by *Atlas Roofing*.

With this in mind, we consider the two statutory causes of action that the FDIC invoked in its enforcement action against Bonan. The Federal Deposit Insurance Act, as codified at 12 U.S.C. § 1818(i), permits the FDIC to impose a civil money penalty on the director of a federally insured bank who "recklessly engages in an unsafe or unsound practice in conducting the affairs of such insured depository institution" or "breaches any fiduciary duty." 12 U.S.C. §§ 1818(i)(2)(B)(i)(II)–(III). Section 1818(e) in turn allows the FDIC to issue an order prohibiting a director from working at any federally insured depository institution based on similar misconduct. See *id.* §§ 1818(e)(1)(A)(ii)–(iii). Based on this shared core of prohibited misconduct, we conclude that neither § 1818(i) nor § 1818(e) is akin to a common law action at the Founding.

We begin with an "unsafe or unsound practice," which underlies the FDIC's imposition on Bonan of both the money penalty and the prohibition order. This standard brings no common law soil with it, as the term likely emerged from nineteenth century state banking laws. See Thomas L. Holzman, *Unsafe or Unsound Practices: Is the Current Judicial Interpretation of the Term Unsafe or Unsound?*, 19 Ann. Rev. Banking L. 425, 429 n.21 (2000). Congress first used "unsafe or

unsound practices" in federal banking law in 1933, and it now serves as a basis for enforcement actions against bank directors across many provisions of federal law. See Heidi Mandanis Schooner, *Fiduciary Duties' Demanding Cousin: Bank Director Liability for Unsafe or Unsound Banking Practices*, 63 Geo. Wash. L. Rev. 175, 202 (1995). Congress has often left unsafe or unsound practices undefined in these provisions, see *id.* at 187–89, deliberately allowing the term to serve as a gap-filling prohibition on conduct not otherwise covered in the federal regulatory scheme, see *id.* at 187. To put the point another way, unsafe or unsound practices is a regulatory—rather than common law—term of art. See Lawrence G. Baxter, *Fiduciary Issues in Federal Banking Regulation*, 56 Law & Contemp. Probs. 7, 23–24 (1993) (describing the duty not to engage in unsafe and unsound conduct as "a fundamental regulatory principle distinctive to federally insured banking").

The most widespread working definition of an unsafe or unsound practice, which the administrative record shows the FDIC relied upon in its action against Bonan, underscores the unique regulatory origins of the term. This definition comes not from common law principles but from the legislative history of the Financial Institutions Supervisory Act of 1966:

> Generally speaking, an 'unsafe or unsound practice' embraces any action, or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds.

Hearings on S. 3158 Before the House Comm. on Banking and Currency, 89th Cong., 2d Sess. 49–50 (1966) (memorandum of John Horne, Chairman of the Federal Home Loan Bank Board); see also, *e.g.*, *Michael v. FDIC*, 687 F.3d 337, 352 (7th Cir. 2012) (using nearly identical language to describe an unsafe or unsound banking practice in the context of § 1818(e)); *Matter of Seidman*, 37 F.3d 911, 926–27 (3d Cir. 1994) (employing this standard verbatim for an action under § 1818(b)); Schooner, *Fiduciary Duties' Demanding Cousin*, at 190 ("In seeking a general definition for unsafe or unsound banking practices, the courts have relied on either Chairman Horne's definition or one almost identical to it.").

As we see it, this definition addresses itself to actions that present risk to the solvency of regulated banks. See Baxter, *Fiduciary Issues*, at 23 ("The duty to act safely and soundly is basically a duty not to take actions that might place the solvency of the banking institution in jeopardy."). And our research has turned up no common law cause of action at the Founding that targets the same conduct or operates under similar legal principles. Cf. *Jarkesy*, 603 U.S. at 134.

So too with the other misconduct element underlying the FDIC's enforcement action against Bonan under §§ 1818(i) & (e): breach of fiduciary duty. At a general level, fiduciary duty is a heartland equitable concept. See Deborah A. DeMott, *Beyond Metaphor: An Analysis of Fiduciary Obligation*, 1988 Duke L. J. 879, 880 (1988) ("As a legal principle, [fiduciary] obligation originated in Equity."). It evolved to prevent the abuse of relationships in which one person has reposed their trust in another. See *id.* And courts of equity—not common law courts—enforced the obligations arising from these relationships. See *Chauffeurs, Teamsters and Helpers, Local No. 391 v.*

*Terry*, 494 U.S. 558, 567 (1990) (observing that "action[s] by a trust beneficiary against a trustee for breach of fiduciary duty" were "within the exclusive jurisdiction of courts of equity" (citing 2 J. Story, Commentaries on Equity Jurisprudence § 960, at 266 (13th ed. 1886))); *CIGNA Corp. v. Amara*, 563 U.S. 421, 439 (2011) (explaining that "before the merger of law and equity," a trust beneficiary "could have brought only in a court of equity" a suit against a trustee who was a "fiduciary"); *Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1351 (7th Cir. 1990) ("[E]nforcing fiduciary duties was equitable in English practice …."), *rev'd on other grounds*, 500 U.S. 90 (1991). We therefore do not see an action to enforce the breach of a fiduciary duty as "a common law suit in all but name." *Jarkesy*, 603 U.S. at 136.

Focusing on the narrower context of banking, Bonan offers us no basis to conclude that fiduciary duties even applied to bank directors at the Founding. See Patricia A. McCoy, *A Political Economy of the Business Judgment Rule in Banking: Implications for Corporate Law*, 47 Case W. Res. L. Rev. 1, 22 (1996) (placing the first reported bank director liability cases in the nineteenth century). It does appear, however, that toward the end of the nineteenth century, courts began to recognize and enforce the fiduciary duties of bank directors, and not solely as creatures of equity. See *id.* at 34–38 (discussing the emergence of common-law tort standards as the most important basis of bank director liability beginning in the 1890s); see also *Bowerman v. Hamner*, 250 U.S. 504, 511 (1919) (describing *Briggs v. Spaulding*, 141 U.S. 132 (1891), as having offered "the rule for determining the common-law liability" of directors of national banks); *Atherton v. FDIC*, 519 U.S. 213, 217 (1997) ("We recognize … that this Court did once articulate federal

common-law corporate governance standards, applicable to federally chartered banks.").

So, by 1966, when Congress added breach of fiduciary duty to the federal banking laws as a basis for bank director sanction, see Baxter, *Fiduciary Issues*, at 26, an action for breach of fiduciary duty in the banking context had twentieth century common law soil. But this is not the kind of common law development that we understand to be legally significant based on *Jarkesy*. Our focus is on the Founding Era, and at that time, breach of fiduciary duty was an equitable action that does not appear to have extended to bank directors.

In our final analysis, then, we conclude that the FDIC's enforcement action under §§ 1818(i) & (e) involves public rights under the reasoning of *Atlas Roofing*. This means that Congress may assign the adjudication of these causes of action to an agency without violating the Seventh Amendment. See also *Ortega v. OCC*, 155 F.4th 394, 403–09 (5th Cir. 2025) (concluding that enforcement actions under § 1818 involve public rights by focusing on the history of federal bank regulation).

## III

We see Bonan's Seventh Amendment claim as a close and challenging call, and it seems prudent to explain why. Here we focus on Congress's incorporation in §§ 1818(i) & (e) of a claim for breach of fiduciary duty as one basis for in-house agency adjudication.

Recall that in *Jarkesy* the Supreme Court described public rights as an exception "to Article III jurisdiction." 603 U.S. at 120. And, while acknowledging that the boundaries of the exception remain fuzzy, the Court was clear on the consequence when a case involves public rights: "no involvement by an

Article III court in the initial adjudication is necessary." *Id.* at 128. Based on this description, it seems sensible to expect Article III (and the case law interpreting it) to inform, if not define, the contours of public and private rights.

This conclusion would suggest that the public rights exception is narrower—and the category of causes of action involving private rights is larger—than what the Court's analysis in *Jarkesy* seems to convey. By its terms, Article III extends the "judicial Power" to "all Cases, in Law and Equity." U.S. Const. art. III, § 2. If the public rights exception attempts to capture those cases that do not fall within this core judicial power, and thereby do not require Article III adjudication in the first instance, see *Jarkesy*, 603 U.S. at 128, it is unclear based on the Constitution's text why rights traditionally adjudicated in courts of equity would be subject to a different public rights analysis than those at common law. Put another way, when it comes to first principles, we do not see why the equitable lineage of fiduciary duties cannot render them private rights in Article III terms.

And, indeed, the Supreme Court's case law has suggested at times that traditional cases in equity involve private rights. In *Murray's Lessee v. Hoboken Land & Improvement Co.*, the case that first recognized the public rights exception, the Supreme Court adopted a definition of private rights that tracked more closely Article III's text, emphasizing that Congress could not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit *at the common law, or in equity, or admiralty*." 59 U.S. (18 How.) 272, 284 (1856) (emphasis added).

This statement of general principle from *Murray's Lessee* has endured to the Court's most recent cases, even to *Jarkesy*.

See *Jarkesy*, 603 U.S. at 132 (referencing this precise language in *Murray's Lessee*); see also *Granfinanciera*, 492 U.S. at 56 (observing in its public rights analysis that "matters from their nature subject to a suit at common law or in equity or admiralty lie at the protected core of Article III judicial power" (quoting *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 n.25 (1982) (plurality opinion by Brennan, J.) (cleaned up))). The Supreme Court has even observed, albeit in dicta, that "breach of fiduciary duty claims … involve private rights which are at the core of matters normally reserved to Article III courts." *Coit Indep. Joint Venture v. Fed. Sav. and Loan Ins. Corp.*, 489 U.S. 561, 578–79 (1989) (cleaned up). All this to say, there is plenty to support the conclusion that private rights encompass traditional actions at equity, including the breach of fiduciary duty claims embedded in §§ 1818(i) & (e). See *Intuit, Inc. v. FTC*, 170 F.4th 411, 418 (5th Cir. 2026) (concluding that traditional actions at both law and equity involve private rights under Article III); but see *id.* at 417 n.5 (suggesting the distinction between law and equity may have been "relevant" if the plaintiff had "claimed a right to a jury trial under the Seventh Amendment").

But we hew closely to the Supreme Court's most recent direction on applying the public rights exception, which comes from *Jarkesy*. And *Jarkesy* clarified that *Atlas Roofing*'s capacious view of public rights does not apply to statutory causes of action borrowed from the common law. It did not pare back *Atlas Roofing*'s application from statutory claims resembling other cases at the core of Article III, like traditional actions at equity. See *Jarkesy*, 603 U.S. at 138 ("[*Atlas Roofing*] does not control here, where the statutory claim is in the nature of a common law suit." (cleaned up)); *id.* at 137–38 ("The cases that *Atlas Roofing* relied upon did not extend the public

rights exception to traditional legal claims. Instead, they applied the exception to actions that were not suits at common law or in the nature of such suits." (cleaned up)); see also *Axalta*, 144 F.4th at 483 (Bibas, J., concurring) ("Together, [the Supreme Court's public rights cases] hold that (1) when Congress creates a cause of action enforced by the government as sovereign, then it involves public rights, unless (2) it resembles a preexisting action at common law.").

As a lower federal court, our role is to follow the Supreme Court's precedent, not guess its future direction. See *Hohn v. United States*, 524 U.S. 236, 252–53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."). The Court has not made clear that statutory causes of action resembling traditional equitable actions involve private rights for the purposes of Seventh Amendment analysis. In time the Justices are sure to consider this question. Until they do, we believe the appropriate path is to adhere to *Atlas Roofing*. It is on this basis that Bonan's Seventh Amendment claim fails.

## IV

We turn next to Bonan's other challenges to the FDIC's enforcement proceeding.

### A

Bonan first contends that the FDIC Board and the agency's administrative law judges were unconstitutionally insulated from presidential oversight during the enforcement proceeding. Specifically, he highlights that the FDIC's Board members serve for a statutorily defined term of years, see 12 U.S.C. § 1812(b)–(c), and that its ALJs enjoy two layers of "for-cause"

protection from removal, see 5 U.S.C. § 7521. Bonan urges that these statutory restrictions on the President's removal power violate Article II of the Constitution and therefore require us to vacate the Board's decision and orders.

For its part, the FDIC does not defend the constitutionality of these removal protections, instead asserting that Bonan is not entitled to relief because he has not shown the removal restrictions caused him compensable harm. We agree that under current law Bonan needs to show harm and has failed to do so, making it unnecessary for us to opine on Bonan's underlying constitutional challenge to the removal restrictions.

Five years ago, in *Collins v. Yellen*, the Supreme Court established that we need not regard "as void" the actions of an unconstitutionally insulated administrative official. 594 U.S. 220, 258 (2021). Unlike in an instance of improper appointment, the Court found "no basis for concluding" that an administrative official enjoying unconstitutional protection from the President's removal power "lacked the authority to carry out the functions of the office." *Id.* at 258. In so holding, however, the Court left open the possibility of relief if the unconstitutional restriction "inflict[ed] compensable harm" on the plaintiff. *Id.* at 259.

To date, *Collins* has come to stand for the proposition that a successful challenge to an administrative action on removal grounds does not entitle a party to relief without a showing that the unconstitutional restriction on the President's power caused compensable harm. See, *e.g.*, *CFPB v. Law Offs. of Crystal Moroney, P.C.*, 63 F.4th 174, 179 (2d Cir. 2023); *Axalta*, 144 F.4th at 479–80; *Calcutt v. FDIC*, 37 F.4th 293, 314–15 (6th Cir. 2022), *rev'd on other grounds*, 598 U.S. 623 (2023); *Bhatti v. Fed. Hous. Fin. Agency*, 15 F.4th 848, 853–54 (8th Cir. 2021);

*Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 756–57 (10th Cir. 2024); *Rodriguez v. Social Sec. Admin.*, 118 F.4th 1302, 1314 (11th Cir. 2024). But see *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 780 (5th Cir. 2025) (limiting *Collins*'s reach to only "retrospective relief from final agency action"). We too adopt this understanding of *Collins*.

*Collins* itself went on to offer some guidance on when an unconstitutional removal restriction might inflict harm. "Suppose, for example, that the President had attempted to remove [an administrative official] but was prevented from doing so by a lower court decision holding that he did not have 'cause' for removal." *Collins*, 594 U.S. at 259. "Or suppose the President had made a public statement expressing displeasure with actions taken by [the official] and had asserted that he would remove [them] if the statute did not stand in the way." *Id.* at 260. We take from these examples that a party challenging a removal restriction must show, at a minimum, that the unconstitutional protection actually impacted the particular action against them. See *Leachco*, 103 F.4th at 756 ("[H]e must demonstrate that the unconstitutional removal provision actually affected the agency's decision or conduct against him."); *L. Offs. of Crystal Moroney*, 63 F.4th at 179–80 (observing that courts have disagreed in the wake of *Collins* about how a party must demonstrate compensable harm and adopting a requirement that "a party must show that the agency action would not have been taken *but for* the President's inability to remove the agency head").

Here, Bonan objects only to the restrictions on removal protecting the FDIC Board and the agency's ALJs, not the process by which such agency officials are appointed. His

challenge thus falls squarely under *Collins*, requiring him to show compensable harm. On this front, Bonan suggests that the President may have chosen to exercise his power to remove FDIC Board members or the agency's ALJs if the restrictions were not in place, pointing to the Solicitor General's position in similar litigation that the insulation of FDIC administrative law judges is unconstitutional. See Notice of Change in Position by FDIC at 1, *CBW Bank v. FDIC*, No. 24-cv-2535 (D. Kan. Feb. 24, 2025), Dkt. No. 33. But Bonan's speculation is insufficient under *Collins*. He has not demonstrated, or for that matter even attempted to show, that the removal restrictions actually affected any aspect of the agency proceeding against him. See *Kaufmann*, 32 F.4th at 850 ("Nothing in the record suggests any link whatsoever between the removal provision and Claimant's case.").

Bonan resists the application of *Collins*'s harm requirement by contending that an unconstitutional removal restriction is a form of structural error that mandates reversal. Structural error cases contain "defect[s] affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). If an error is structural, it mandates automatic reversal, and harmless error does not apply. See *Washington v. Recuenco*, 548 U.S. 212, 218 (2006). The Supreme Court has recognized structural error only in a "very limited class of cases," *Neder v. United States*, 527 U.S. 1, 8 (1999) (cleaned up), often in which the error deprives a criminal defendant of the basic protections of a criminal trial, see *id.* (collecting examples).

The reasoning of *Collins* counsels against classifying an unconstitutional removal restriction as structural error. The

Supreme Court held that we need not void or undo every action of an unconstitutionally insulated agency official. See *Collins*, 594 U.S. at 259 ("We therefore see no reason to hold that the [challenged action] must be completely undone."). This is a far cry from an error that "will *always* render a trial unfair." *Neder*, 527 U.S. at 9. Although Bonan points out that *Collins* did not address a party-specific agency adjudication, its reasoning extends beyond its facts: the Court emphasized that there was no basis to conclude the agency actors "lacked the authority to carry out the functions of the office." *Collins*, 594 U.S. at 258.

Bonan has given us no reason to conclude that the FDIC's removal protections for its Board and ALJs caused them to lack the authority to oversee the enforcement proceedings. And several circuits have applied *Collins*'s harm requirement to party-specific adjudication before an agency. See, *e.g.*, *Calcutt*, 37 F.4th at 314–17 (applying *Collins*'s harm requirement to FDIC enforcement proceedings); *Axalta*, 144 F.4th at 479–80 (same for Federal Aviation Administration enforcement proceedings); *Leachco*, 103 F.4th at 755–58 (same for Consumer Product Safety Commission enforcement proceedings); *Kaufmann*, 32 F.4th at 849–50 (same for the Social Security Administration's adjudication of a request for disability benefits); *Rodriguez*, 118 F.4th at 1314 (same). In light of *Collins*, we decline to deviate from this consensus.

B

We can make quick work of Bonan's three proffered bases to conclude that the FDIC's administrative proceedings violated his right to due process under the Fifth Amendment.

Bonan first suggests that the FDIC impermissibly served as both the prosecution and judge in the administrative enforcement action, clouding the agency's ability to evenhandedly adjudicate the claims against him. He is correct that "a fair hearing before a fair and unbiased adjudicator is a basic requirement of due process," *Schneiter v. Carr*, 148 F.4th 438, 450 (7th Cir. 2025) (cleaned up), but "the standard for proving bias is not easily satisfied," *id.* We apply a "presumption of honesty and integrity in those serving as adjudicators," including in administrative settings. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Bonan can overcome this presumption only by "laying a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable." *Schneiter*, 148 F.4th at 450 (cleaned up). And the Supreme Court has expressly held that "the combination of investigative and adjudicative functions [in the same administrative agency] does not, without more, constitute a due process violation." *Withrow*, 421 U.S. at 58.

Bonan has not carried his burden of showing bias. Indeed, he mainly raises general contentions that FDIC ALJs necessarily favor the agency. But this type of categorical speculation is insufficient to rebut the presumption of honesty after *Withrow*. When he does attempt to demonstrate actual bias in his hearing, Bonan recites a litany of decisions on the part of the presiding ALJ with which he disagrees. But our case law is unequivocal: "adverse rulings alone are not evidence of bias." *Bachner v. Comm'r of Internal Revenue*, 124 F.4th 1066, 1073 (7th Cir. 2025).

Bonan next urges that his inability to take depositions prior to his hearing violated his due process rights. "But there is no constitutional right to pretrial discovery in

administrative proceedings." *Kelly v. EPA*, 203 F.3d 519, 523 (7th Cir. 2000). Rather, "discovery must be granted if in the particular situation a refusal to do so would so prejudice a party as to deny him due process." *Mister Discount Stockbrokers, Inc. v. SEC*, 768 F.2d 875, 878 (7th Cir. 1985) (cleaned up).

Bonan fails to demonstrate that his lack of access to pretrial depositions rendered his hearing before the FDIC fundamentally unfair. He concedes that he did in fact depose several witnesses who were unavailable at the hearing, and he does not dispute that he was able to cross-examine witnesses who testified. See *Kelly*, 203 F.3d at 523 (rejecting the plaintiffs' challenge to the lack of discovery in EPA proceedings in part because they could have cross-examined witnesses during their hearing). Without more, his general complaint that the FDIC had greater access to pretrial discovery does not rise to the level of a due process violation.

Finally, Bonan contends that the FDIC failed to properly serve him with the Notice of Charges. But the FDIC Board found that the agency served Bonan via overnight courier at his residence. Bonan did not dispute at the administrative level that this service occurred. See 12 C.F.R. § 308 app. A § 308.39(b)(1) ("Failure of a party to file exceptions to [an FDIC ALJ's findings] within the time prescribed is deemed a waiver of objection thereto."); cf. *Porosh v. Garland*, 56 F.4th 1120, 1125 (7th Cir. 2023) (observing that "[f]ailure to challenge [the] finding" of an agency adjudicator on administrative appeal "results in waiver"). Nor does he explicitly dispute that fact before us now. We see no reason why such service was constitutionally insufficient.

## C

This brings us to Bonan's final set of challenges to the FDIC's action against him. He asserts that, as a substantive matter, the administrative record does not support the imposition of the prohibition order or the $105,000 civil money penalty.

On this front our review of the agency's action is deferential. See 12 U.S.C. § 1818(h)(2) (incorporating the standards of the Administrative Procedure Act, 5 U.S.C. § 706, into judicial review of proceedings under § 1818). "We will set aside the Board's findings only if unsupported by substantial evidence on the record as a whole," *Michael*, 687 F.3d at 348, which we define as "such relevant evidence a reasonable person would deem adequate to support the ultimate conclusion," *id.* We will disturb the FDIC Board's legal conclusions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)). The FDIC Board "abuses its discretion only when it imposes a sanction that is unwarranted in law or without justification in fact." *Id.* (cleaned up).

### 1. The Prohibition Order

To impose a prohibition order under § 1818(e)(1), permanently removing a bank officer or director from working at a federally insured depository institution, the FDIC must present substantial evidence of "misconduct, with certain adverse effects, committed with a culpable state of mind." *Landry v. FDIC*, 204 F.3d 1125, 1138 (D.C. Cir. 2000). The FDIC Board concluded that Bonan's role in Grand Rivers's loan to 618 Holdings satisfied this statutory standard. The

administrative record shows that substantial evidence supports this conclusion.

On the "misconduct" prong, the FDIC had to show that the banker has, "directly or indirectly," (i) violated "any law or regulation"; (ii) "engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution"; or (iii) "committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty." § 1818(e)(1)(A).

The FDIC Board found that Bonan had engaged in unsafe or unsound banking practices and breached his fiduciary duties of care and loyalty to Grand Rivers. Bonan insists that the record evidence fell short of supporting this finding as to unsafe or unsound practices because the FDIC failed to show that his conduct threatened the overall financial stability of Grand Rivers. See *Michael*, 687 F.3d at 352 (defining "unsafe or unsound practice" to require "abnormal risk of financial loss or damage on a banking institution").

As a pure legal matter, Bonan may have a point. See *Calcutt*, 37 F.4th at 326 (concluding that the FDIC's argument "that the statute does not require a finding of a threat to bank stability in order to find 'unsafe or unsound' practice" contradicts the analysis of several circuit cases); see also *Johnson v. OTS*, 81 F.3d 195, 204 (D.C. Cir. 1996) (observing that "the weight of case law" holds that "the unsafe or unsound practice provision refers only to practices that threaten the financial integrity of the association" (cleaned up)). But we need not resolve the precise level of risk to a bank that the FDIC must show to support the finding of an unsafe or unsound practice because we see substantial evidence that Bonan breached his fiduciary duty of care to Grand Rivers. See *Dodge*

*v. Comptroller of Currency*, 744 F.3d 148, 156 (D.C. Cir. 2014)
(observing that it suffices under § 1818(e)(1)(A) if the court
upholds the misconduct finding on only one statutory basis);
see also *Michael*, 687 F.3d at 351 (examining § 1818(e)(1)(A)
and reaching a similar conclusion).

Our prior decision in *Michael* supplies guidance on what it
means to breach a fiduciary duty within the meaning of the
Federal Deposit Insurance Act. At a foundational level, we
seemed in *Michael* to draw on generic common law concepts
to interpret and define the content of a fiduciary duty as a
matter of federal law. See 687 F.3d at 350–51 (relying on stand-
ards from the Revised Model Business Corporation Act and
the Employment Retirement Income Security Act of 1974). In
cursory fashion, Bonan invites us to instead apply Illinois cor-
porate law. We recognize the choice of law question in § 1818
admits of some debate. See *Landry*, 204 F.3d at 1138 (leaving
open whether fiduciary breach under § 1818(e)(1)(A)(iii) is a
matter of state or federal law); see also *Calcutt*, 37 F.4th at 356–
57 (Murphy, J., dissenting) (describing positions on both
sides). But, in the absence of any compelling argument on Bo-
nan's part, we will follow the standard from *Michael*.

The FDIC Board relied on federal law to define Bonan's
fiduciary duties, and substantial evidence supports the FDIC
Board's conclusion that Bonan's conduct leading up to Grand
Rivers's loan to 618 Holdings breached his fiduciary duty of
care.

Directors and officers owe a duty of care to their bank. See
*Seidman*, 37 F.3d at 933 (quoting the Revised Model Business
Corporation Act § 8.42). This duty required Bonan to act
"with the care an ordinarily prudent person in a like position
would exercise under similar circumstances." *Id.* (cleaned

up). The record amply supports that he did not do so. As chairman of Grand Rivers, Bonan actively solicited and influenced the terms of a sizeable loan to two individuals he personally employed, James Harbison and Adam Tate, whom he should have known had no repayment capacity and posed significant credit risk.

Bonan begs to differ, telling us that he had sound business reasons for supporting the loan to 618 Holdings, including that the company's purchase of the warehouse would infuse Evergreen with cash needed to stay in business while the oil market stabilized. But substantial evidence supports the Board's conclusion that this argument is not compelling in the face of Harbison and Tate's manifest lack of creditworthiness. Put another way, Bonan cannot explain why his ostensible business reasons should altogether displace considerations of a borrower's income and ability to satisfy a loan obligation. Indeed, Bonan all but invites a complete abandonment of the diligence reasonably expected to accompany responsible lending decisions.

In the next step of its analysis, the FDIC Board found that Bonan's misconduct satisfied the "effects" prong of § 1818(e)(1) because, "by reason of the … breach," Grand Rivers "suffered … financial loss." § 1818(e)(1)(B)(i). Substantial evidence supports this finding too. Grand Rivers charged off $513,760 from the 618 Holdings loan. Further, 618 Holdings defaulted and entered into a deed-in-lieu of foreclosure with Grand Rivers. As a result, by the time of the FDIC's administrative proceeding, Grand Rivers held the deed to the warehouse and had only received offers on the property well below the amount then due on the loan.

Bonan does not dispute these facts or financial consequences. Instead, he urges that they were not "by reason of" his conduct, a statutory standard he interprets to require that the loss be "reasonably foreseeable" to the offender. See *De La Fuente v. FDIC*, 332 F.3d 1208, 1223 (9th Cir. 2003); see also *id.* (describing this standard as one of proximate causation). But, even accepting Bonan's preferred standard, the Board found, and substantial evidence supports, that it was reasonably foreseeable that Grand Rivers would suffer financial loss from lending $1.25 million, at Bonan's behest, to two individuals whose combined income was less than the annual payments required by the loan and who had no other assets.

Finally, as to the "culpability" prong of § 1818(e)(1), the FDIC Board found that Bonan had exhibited "willful … disregard … for the safety or soundness of" Grand Rivers. 12 U.S.C. § 1818(e)(1)(C)(ii). "Willful disregard is deliberate conduct that exposes the bank to abnormal risk of loss or harm contrary to prudent banking practices." *Michael*, 687 F.3d at 352 (cleaned up). Here, too, ample evidence supports the Board's finding that Bonan's involvement in the 618 Holdings loan satisfied this standard. He initiated and indeed pushed through the loan to two eminently uncreditworthy borrowers, whose financial circumstances were no secret to him. Bonan also dictated key terms of the leaseback agreement so that Grand Rivers's loan was funding both 618 Holdings's purchase of the warehouse and Evergreen's initial ability to make lease payments. Overall, Bonan's deliberate efforts to put Grand Rivers in this position exposed the bank to an abnormal risk of harm contrary to prudent banking practices—or at least the FDIC could have concluded as much based on substantial evidence.

### 2. Civil Money Penalty

We come last to the Board's conclusion that Bonan's actions satisfied the statutory requirements for a second tier civil money penalty. The misconduct elements under 12 U.S.C. § 1818(i)(2)(B) largely track those governing the FDIC's imposition of a prohibition order, including establishing liability for "breach[] of any fiduciary duty." *Id.* § 1818(i)(2)(B)(i)(III). On the effects prong, the FDIC must show that the breach "is part of a pattern of misconduct," "causes or is likely to cause more than a minimal loss to such depository institution," or "results in pecuniary gain or other benefit to such party." *Id.* §§ 1818(i)(2)(B)(ii)(I)–(III).

Our analysis of the prohibition order resolves and disposes of Bonan's challenge to this sanction. Substantial evidence again supports the Board's finding that Bonan's lead role in the 618 Holdings loan in and of itself breached his fiduciary duty to Grand Rivers and that his conduct caused more than a minimal loss to the bank. Bonan primarily directs his challenges to the Board's separate analysis that the release of Grand Rivers's security interest in Rig 23 also supported a civil money penalty. But we agree with the FDIC that Bonan's involvement in the 618 Holdings loan was sufficient to support the penalty, and we need not reach the alternative grounds. Cf. *Michael*, 687 F.3d at 348 (agreeing with the FDIC Board that the defendants' complicity "in any one of these transactions" was "sufficient to support removal").

\* \* \*

For these reasons, we DENY the petition for review.